IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 16, 2004

## STATE OF TENNESSEE v. DANIEL WADE WILSON

**Appeal from the Criminal Court for Sullivan County**
**No. S42,735    Phyllis H. Miller, Judge**

_____

**No. E2003-02070-CCA-R3-CD**
**May 26, 2004**
_____

The defendant, Daniel Wade Wilson, appeals as of right from his convictions by a jury in the Sullivan County Criminal Court for first degree felony murder and especially aggravated robbery, a Class A felony. The trial court sentenced the defendant to consecutive sentences of life in prison for the first degree felony murder conviction and twenty-three years for the especially aggravated robbery conviction. He contends that the evidence is insufficient to convict him of felony murder or especially aggravated robbery and that the trial court erred by ordering consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

A.D. Jones, Jr., Bristol, Tennessee, for the appellant, Daniel Wade Wilson.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Deputy District Attorney General, and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the death of David Vestal at Steele's Creek Park on April 5, 1999. Rocky Smith testified that he was jogging at Steele's Creek Park on April 5 at about 8:00 a.m. when he saw the victim's body beside the trail at the edge of a lake. He said he knew that Lieutenant Jack Necessary was in the park and showed him the body. On cross-examination, Mr. Smith testified that when he saw the body, he was shocked and backed away from it.

Detective Charles Thomas of the Bristol Police Department testified that shortly after 8:00 a.m. on April 5, 1999, Lieutenant Necessary called him for assistance at Steele's Creek Park. He

said that upon his arrival at the park, he saw the victim's body and noticed blood on both the body and on the park's trail. He said gravel on the trail looked as if it had been disturbed. He said he found two Busch beer bottles on the trail but did not find a weapon. He said he also searched the victim's pockets but did not find a wallet or cash. He said that the distance between the first drops of blood and the final drops of blood on the trail was 277 feet and that the blood on the trail alternated between heavy and lighter amounts. He said a puddle of blood on the trail near the victim's body was about eight to ten inches wide and twelve inches in length. He said that the moss and grass between the puddle of blood and the body looked like it had been brushed with blood.

On cross-examination, Detective Thomas testified that several officers and other personnel investigating the victim's death walked on the trail near where the victim's body was found. He said that blood appeared to be on one of the Busch beer bottles but that they never tested it to determine whose blood was on it. He also testified that they did not test every sample of blood they found on the trail to determine whose blood they had collected. He acknowledged that he saw signs of a struggle on the trail, including parted gravel and dirt. He said the victim had a .23 blood alcohol level.

Brandon Alford testified that he knew the defendant but that they were not friends. He said he had known Jared Christein for about one month before the homicide. He said that he lived with his girlfriend, Sissy Lingerfelt,[1] and that he met the defendant and Jared Christein in the afternoon on April 4, 1999, at Ms. Lingerfelt's trailer, which was about one mile from Steele's Creek Park. He said the defendant drove them to the One Stop to buy marijuana and that later in the afternoon Ms. Lingerfelt drove them to the Food Lion to buy beer. He said they bought twenty-four Natural Ice beers at the store. He said that Ms. Lingerfelt drove them to her mother's house and then to Big Creek and that she agreed to return in two to three hours. Mr. Alford said that while he, Mr. Christein, and the defendant were at Big Creek, they smoked marijuana and drank beer. He said the defendant had a knife with him, which he used to gig frogs.

Mr. Alford testified that Ms. Lingerfelt never returned to Big Creek and that when he saw Kim Bolling in a car, he asked her for a ride home. He said that Ms. Bolling was with the victim, whom he recognized from high school. He said Ms. Bolling agreed to give the three of them a ride home. He said that on the way back from Big Creek, the victim was driving "crazy" and even ran off the road at one point. He said that Mr. Christein and the defendant told the victim that if they were hurt by his driving, they would "kick his butt." He said that Ms. Bolling told the victim to slow down but that he continued driving erratically. He said Ms. Bolling pulled the emergency brake and removed the keys from the ignition. He said that the victim and Ms. Bolling argued but that the victim relented and let her drive. He said that everyone was angry with the victim until he let Ms. Bolling drive.

Mr. Alford testified that he heard the defendant and Mr. Christein talking about fighting the victim and taking his wallet but that he ignored them. He said they pulled over at Lake View

---

[1] Sissy Lingerfelt is also referred to as Verna Sue Wheeler in the record and in the parties' briefs.

Marina, where they drank beer and smoked marijuana. He said that after leaving the marina, they went to a convenience store, where the victim purchased Busch beer. He said that while the victim was in the store, they tried to convince Ms. Bolling to leave him there. He said Mr. Christein again stated that they should fight the victim and take his wallet. He said the defendant had his knife in his hand at the time. He said that when the victim returned to the car, Mr. Christein told the victim that he had marijuana hidden at Steele's Creek Park and asked if he would drive him there. Mr. Alford said he asked to be dropped off at Ms. Lingerfelt's trailer before they went to the park. He said that he went to bed around 2:30 a.m. and some time after that Mr. Christein knocked on his door. He said he let Mr. Christein in and went back to bed. He said that the next morning, he saw Mr. Christein remove thirty dollars from his sock although Mr. Christein did not have any money the night before. He said the defendant wore jeans, a bandana, and a tie-dyed shirt with a skull on it on April 4.

On cross-examination, Mr. Alford testified that Mr. Christein had bragged to them about crimes he had committed. He said that April 4, 1999, was the first time he had talked with the defendant. He said the defendant had money that day but did not know where to get marijuana. He said that the defendant gave him the money to get marijuana at One Stop and that the defendant bought all the beer that day. He said he introduced the defendant to Mr. Christein on that day. He said he was drunk while they were at Big Creek. He said that the defendant used his knife to stir up marijuana in the bowl in which they were smoking it and that the defendant never threatened anyone with his knife. He said that he never intended to fight the victim and that he believed their talking about fighting the victim because of his driving was just "drunk talk." He said he did not know if Mr. Christein actually had marijuana at Steele's Creek Park when Mr. Christein asked the victim to drive him to the park. He said that he asked to be dropped off at his trailer because he wanted to find out why Ms. Lingerfelt had never returned to Big Creek. He said the defendant had been happy to share his marijuana and beer with everyone on April 4. He said that Mr. Christein mentioned that he needed to get thirty dollars for records he had sold and that this conversation occurred before he saw Mr. Christein remove thirty dollars from his sock.

Bristol Police Lieutenant Jack Necessary testified that at 7:20 a.m. on April 5, 1999, he was jogging at Steele's Creek Park. He said that while he was jogging he noticed disturbed gravel, beer bottles, and tire marks on the trail. He said Mr. Smith found him and showed him the victim's body. He said that later that day, he spoke with the defendant and told him that they needed to talk about the incident at Steele's Creek Park. He said that the defendant's body tensed and that the defendant also clenched his fist. He said that in his initial interview with the defendant, the defendant said that he was not at Steele's Creek Park on April 4, that scratches on his left hand were from his job, and that he was wearing the same clothes as the night before. Lieutenant Necessary said that when he went to the defendant's trailer, he found a tie-dyed shirt and jeans with blood on them.

On cross-examination, Lieutenant Necessary testified that the tire marks on the trail could not have come from a public vehicle because the access gate at the park was locked. He said eight officers responded to the call that a body had been found at Steele's Creek Park. He acknowledged that people respond in different ways when questioned by police. He said that when he approached

-3-

the defendant at work, the defendant did not try to run and did not hide his knife. He said that he did not test the defendant to determine if he was still intoxicated during the interview. He acknowledged that he did not make a record of this meeting with the defendant. He said he was not aware of any pictures being taken of the back of the defendant's head or his neck area. He said he did not remember collecting a bandana from the defendant's trailer and later returning it to the defendant's girlfriend.

Bristol Police Lieutenant Jerry Smelser testified that Mr. Alford told him where to find the defendant and that he relayed this information to the police station. He said that when he told Mr. Alford that the victim had been killed, Mr. Alford vomited.

Lieutenant Smelser said that he interviewed the defendant at the police station and that the defendant provided the following statement: He went with Mr. Alford and Mr. Christein to buy beer, and they were later dropped off at Big Creek by Ms. Lingerfelt. While at Big Creek, they drank the beer and smoked marijuana. Ms. Lingerfelt never returned to pick them up, but Mr. Alford saw two people he knew and asked them for a ride. The man and the woman to whom Mr. Alford talked were arguing but eventually agreed to give the three of them a ride. The man was drunk and driving erratically, even driving off the road at one point. The woman argued with him about his driving and took the keys to the car away from him. After punching the dashboard and windshield, the man agreed to let her drive. Mr. Christein said they should fight the man at Steele's Creek Park and take his money. They stopped at a convenience store to buy more beer, and the man began arguing with the woman again. Mr. Christein told the man that he had one-quarter pound of marijuana hidden at Steele's Creek Park and told him that he would share it if he would drive him there, to which the man agreed. Mr. Alford asked to be let out at his trailer before they went to the park.

The statement said that the woman parked at the entrance to the park and that the defendant went with Mr. Christein and the man into the park. The man kept asking about the marijuana, and Mr. Christein responded each time that it was just around the bend. The man realized that Mr. Christein had lied about the marijuana and "got crazy" toward them. He started yelling and swinging at the defendant. He tried to fight the man and then attempted to run, but the man caught him by the neck of his shirt. The man would not get off him and left scratches on his wrist. Mr. Christein did not help and only watched the struggle. He said he pulled out his knife and began jabbing at the man. He did not quit until the victim let go. He saw a dark spot on the victim, who collapsed. Mr. Christein took the man's wallet and kicked him over the embankment. He and Mr. Christein ran from the park and went to Mr. Alford's trailer. Mr. Christein took money out of the wallet and tried to rip the wallet to pieces. After attempting to burn the wallet, they tossed it in a creek bed, where the defendant covered it with a rock. He went home, where he became ill and scared.

The defendant said that he knew about the robbery plan but that he only went to the park to retrieve the marijuana that Mr. Christein had said was there. He said that he knew that what he had done was wrong but that he did not take any of the man's money. Lieutenant Smelser testified that he did not see any injuries other than scratches on the defendant when he interviewed him.

-4-

On cross-examination, Lieutenant Smelser testified that he did not see any braces on the defendant's teeth. He said he did not record his conversation with Mr. Alford at the trailer park or his interview with the defendant at the police station. He said he did not know the defendant's education level. He acknowledged that although the defendant told him that he was drinking beer the night before the interview, he did not give the defendant a blood-alcohol test. He said he did not ask the defendant if he was in fear for his life when the victim attacked him. He said he did not let the defendant write his own statement. He said he did not take notes during the first forty-five minutes of his interview with the defendant. He denied telling the defendant that he would try to help him. He said he did not notice a screwdriver in the defendant's back pocket during the interview. On redirect examination, Lieutenant Smelser testified that he read the statement to the defendant after he had written it to ensure that it was accurate. He said the defendant never stated that he was hit by a beer bottle and did not tell him that he was in fear for his life when the victim attacked him.

Bristol Police Detective Debbie McCulley testified that she accompanied Mr. Christein to a creek bank near the trailer park where Mr. Alford lived and found a wallet that was partially buried. She said that the wallet had a social security card, a driver's license, and several other cards with the victim's name on them but that no money was in the wallet. She said that she saw the defendant at the police station but that he did not complain about any injuries to his face or jaw. On cross-examination, Detective McCulley testified that she did not question the defendant at the police station and that it was not her job to find out details about the case from him. She said she did not notice braces on the defendant's teeth.

Detective Thomas, recalled by the state, testified that on April 5, 1999, that he did not see any injuries on the defendant, that the defendant never complained about being injured, and that the defendant did not appear to have a problem eating a sandwich that was provided for him at the police station. He said he saw metal in the defendant's mouth and assumed he wore braces. On cross-examination, Detective Thomas testified that he removed the screwdriver from the defendant's pocket at the police station.

Forensic Pathologist Dr. Gretal Harlan testified that on April 5, 1999, around 11:30 a.m., she arrived at Steele's Creek Park and examined the victim's body and the surrounding area. She said the areas on the trail with heavier concentrations of blood were places where the victim had likely pitched forward. She said the area between the victim's body and the trail indicated that the victim did not use his feet to get there and was consistent with being dragged. She said that the victim was five feet, eleven inches tall, that he weighed 155 pounds, and that a blood sample showed his blood alcohol level was .233. She said that the victim only had a thumb and the nubs of his fingers on his left hand. She said the victim's fingers had been amputated several years before his death.

Dr. Harlan testified that the victim lost blood from many different wounds but that the fatal wound was on the left side of the neck. She said he also had wounds on his lip, chin, the right side of his neck, his right buttock, and his upper back. She said the wound to the left side of the victim's neck was three inches deep and could have been made by the defendant's knife. She said the victim

also had bruises and scrapes on his knee, forearm, and head. She said these injuries were consistent with falling down. She said the victim died of blood loss, not from drowning. She said the victim died between seven and thirty minutes after receiving the fatal wound to the neck. She said that the distances between some of the spots of blood on the trail in the park were consistent with the victim's running.

Dr. Harlan testified that because of the victim's intoxication, he would have been unsteady on his feet and would have had difficulty responding to an attack. She said bruising to the back of the victim's knuckles was consistent with him being in a fight. She acknowledged, however, that this could have resulted from his hitting a dashboard or windshield. She said the victim's bruising to his knuckles was such that if he hit a person in the face, that person's face should show signs of the hit. She also said that if a person was hit in the nose with a beer bottle, that person's nose would likely be damaged. She said that because the victim did not have any fingers on his left hand, it would have been difficult for him to grab or hold onto something. She said she did not see any defensive wounds on the victim's hands. She said that it was likely that several of the victim's wounds, including the fatal one, occurred while the attacker was facing the victim.

On cross-examination, Dr. Harlan testified that an intoxicated person may overreact, has less inhibitions, and is more likely to fight. She acknowledged that the lack of defensive wounds on the victim could indicate that the victim was the aggressor. She said that although it would be difficult for the defendant to have inflicted the fatal wound while his back was to the victim, it was not impossible. She said that glancing blows to the back of the head with a beer bottle would be hard to see if that person were not bleeding from the hit. She said the struggle between the victim and his attacker may have lasted more than four minutes.

Gracie Oliver, the defendant's mother, testified that at the time of the victim's death, the defendant had braces and that they were noticeable. Dwight Lacy, a Registered Nurse Health Administrator for the Department of Correction testified that on April 8, 1999, he saw that the defendant had an old injury to his jaw and that he had wires on his teeth. On cross-examination, Mr. Lacy testified that the defendant did not complain about a head or facial injury.

Sissy Lingerfelt testified that she was the defendant's cousin and that she was dating and living with Mr. Alford on April 4, 1999. She said Mr. Alford and Mr. Christein were good friends at the time. She said that on April 4, the defendant, Mr. Alford, and Mr. Christein borrowed her car to buy marijuana. She said that later, she drove them to the store to get beer, to her mother's house, and then to Big Creek. She said she was not drinking or smoking marijuana that day because she was pregnant. She said she drove the defendant, Mr. Alford, and Mr. Christein to Big Creek at 6:30 p.m. and told them that she would return in a couple hours to pick them up. She said the defendant was wearing a bandana and had braces in his mouth. She said the defendant, Mr. Alford, and Mr. Christein were drunk when she dropped them off at Big Creek.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions for first degree felony murder and especially aggravated robbery. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree felony murder is, in pertinent part, an unlawful "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). Especially aggravated robbery is defined as robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" T.C.A. § 39-11-106(a)(5)(B).

When initially interviewed by Lieutenant Necessary on April 5, 1999, the defendant lied about his involvement in the victim's death. In a second interview with police, the defendant acknowledged that on April 4, he told the victim that if he was injured because of the victim's driving, he was going to "kick his butt." Mr. Alford testified that both the defendant and Mr. Christein discussed beating up the victim and taking his wallet at Steele's Creek Park. Mr. Alford also said the defendant had a knife in his hands while they were in the car before they took the victim to Steele's Creek Park. Unlike Mr. Alford, when Mr. Christein lured the victim to Steele's Creek Park, the defendant joined him. While they were at the park, the defendant acknowledged stabbing the victim with his knife. Although the defendant claimed that the victim grabbed him from behind as he attempted to run away, Dr. Harlan testified that because the victim did not have any fingers on one hand, it was unlikely that he would have been able to grab anything. Moreover, Dr. Harlan said the victim's blood alcohol level would have made it difficult for him to respond to an attack. She also said it was unlikely that the victim's fatal wound to the neck occurred while the defendant's back was to the victim. The defendant acknowledged that Mr. Christein took the victim's wallet and money and that when Mr. Christein threw the wallet in a creek bed, the defendant covered it with a rock. A rational juror could find that the defendant and Mr. Christein lured the victim to Steele's Creek Park to rob him, that the defendant stabbed the victim with his knife in order to get the victim's money, and that the defendant and Mr. Christein then took the victim's wallet and his money. We conclude that in the light most favorable to the state, the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant committed first degree felony murder and especially aggravated robbery.

## II. SENTENCING

The defendant contends that it was unjust for the trial court to order his first degree felony murder and especially aggravated robbery sentences to be served consecutively. Specifically, he claims the trial court erred by finding him to be a dangerous offender because, with concurrent sentences, he will still not be eligible for parole until he is seventy years old and no evidence exists that he will be dangerous at that time. The state contends that the trial court properly ordered consecutive sentences. We agree with the state.

The trial court found that the defendant had an extensive record of criminal activity and that the defendant was a dangerous offender, stating that his behavior indicated little or no regard for human life and that he had no hesitation, in the present or in past offenses, about committing a crime in which the risk to human life was high. See T.C.A. § 40-35-115(b)(2), (4). The trial court ordered the especially aggravated robbery sentence to run consecutively to the felony murder sentence.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

The presentence report reveals that the defendant, twenty-four years old at the time of sentencing, had many prior convictions, including possession of drugs, felony evading arrest, felony criminal mischief, and felony reckless endangerment. In addition, the defendant had six disciplinary infractions after being sent to prison, including two for possession of a deadly weapon. We conclude that the defendant's prior convictions, combined with his extensive drug use and possessing deadly weapons while in prison, demonstrate an extensive criminal history that justifies consecutive sentencing.

In addition to finding that the defendant had an extensive criminal history, the trial court found that the defendant should receive consecutive sentences because he was a dangerous offender. To base consecutive sentences upon the dangerous offender classification, the trial court must find that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). In the present case, the trial court stated its findings on the record and determined that the defendant qualified as a dangerous offender. We believe the effective sentence of seventy-four years reasonably relates to the severity of the defendant's offenses. The defendant suddenly attacked an unarmed victim by stabbing him repeatedly and as a result, the victim died. Furthermore, the defendant's behavior from

his prior convictions and while in prison reflect continued violence, and we believe consecutive sentences are necessary to protect society from him. In addition, the defendant provides no authority for his claim that the defendant's age at the time of release is relevant to the trial court's classification of the defendant as a dangerous offender as required by Rule 27(a)(7), T.R.A.P. We conclude that the trial court properly ordered consecutive sentencing.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE